NEWELL CO., a Delaware corporation, Plaintiff,

v.

VERMONT AMERICAN CORPORATION, a Delaware corporation, and Lee B. Thomas, Jr., Defendants.

No. 89 C 5202.

United States District Court, N.D. Illinois, E.D.

Oct. 13, 1989.

Walter C. Greenough, Frederick J. Sperling, Yvonne E. Mena and Jonathan H. Margolies, Schiff, Hardin & Waitee, Chicago, Ill., for plaintiff.

Stephen D. Alexander and Diana Tabacopoulos, Fried, Frank, Harris, Shriver & Jacobson, Los Angeles, Cal., Alan S. Rutkoff, William P. Schuman and Kenneth A. Grady, McDermott, Will & Emery, and Tyrone C. Fahner, Herbert L. Zarov and Michael J. Alter, Mayer Brown & Platt, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

ZAGEL, District Judge.

This dispute arises out of plaintiff Newell Company's ("Newell"), attempts to obtain a significant stake in Vermont American Corporation. Defendants are Vermont American and, Lee Thomas, Jr., Chairman of the Board of Directors of Vermont American (collectively referred to as "Vermont American" or the "Board"). Although Vermont American has been a public corporation since 1966, it has several characteristics reminiscent of its origins as a family run organization. Many members of the Thomas family sit on the Board and are involved in the management of the company. The company's growth, profit and defined culture are a product of the management style of Lee Thomas, Sr. when he was alive, and now, Lee Thomas, Jr. ("Lee Thomas").

Since at least 1986 Newell has sought to increase its ownership in Vermont American. Its advances have not been overwhelmingly successful. Most recently, on June 5, 1989, Newell commenced a partial tender offer to purchase approximately 10% of Vermont American's outstanding stock to add to the approximately 11% Newell already owned. On June 29, 1989, Newell came before this Court seeking to enjoin Vermont American; it complained

that certain actions by Vermont American since Newell announced its tender offer, specifically Vermont American's stock repurchase program, the restructuring of the proposed merger with Clairson, International and the lowering of the trigger point on an existing Shareholder Rights Plan, violate Delaware state law and the federal securities law. I granted a preliminary injunction (Oral Ruling, June 30, 1989), enjoining Vermont American from continuing with its repurchase program. Newell, in effect, was also enjoined, as the injunction was contingent on Newell no longer purchasing shares through its tender offer.

Discovery ensued. Vermont American filed counterclaims alleging that Newell has failed to make proper disclosures under the federal securities laws with respect to its investments in Vermont American. The matter was tried on its merits.

## I. FINDINGS OF FACT

### A. *The Defendants*

1. Vermont American Corporation is a Delaware corporation, with its principal place of business in Louisville, Kentucky. It is the world's largest manufacturer and marketer of cutting tools and quality hand tools, as well as a manufacturer in the lawn and garden products industry.

2. Until the late 1960's, all of the stock of Vermont American was privately held by the members of the family of Lee Thomas, Sr., who founded the company. Mr. Thomas, Sr. died in March, 1988.

3. In approximately 1966 Vermont American became a public corporation. Its stock is traded publicly on the American Stock Exchange. Currently, there are approximately 9,810,675 outstanding shares of Class A Common Stock, and 1,024,231 outstanding shares of Class B common Stock. Holders of Class B Common Stock

are not entitled to vote. In all other respects the rights of Class A and Class B shareholders are identical.

4. The management of Vermont American is dominated by the Thomas family. Lee Thomas, Sr. had three children: Lee Thomas, Jr., the Chairman of the Vermont American Board of Directors;[1] Ellen Thomas Dunbar, a member of the Board; and Jane Thomas Hamilton who has no affiliation with the company, but whose husband is a member of the Board.

5. Defendant Lee Thomas beneficially owned (as defined under SEC regulations), as of June 14, 1989, more than 3,500,000 shares or approximately 34.8% of the outstanding Class A Common Stock of Vermont American. As of March 3, 1989, Thomas' son, Glenn Thomas, the company's Vice President–Engineering and director, beneficially owns approximately 5.9% of Class A shares. Ellen Dunbar owns approximately 8.6% of the stock. Her son, Tom Dunbar, is President of a subsidiary, Vermont American Canada, Inc., and a director of Vermont American and owns approximately .4% of the stock.[2] Additional stock is owned by other members of the Thomas and Dunbar families.

6. Lee Thomas' salary for 1988 was just under $200,000. He receives an additional $2,000 for his services as Chairman of the Board. He also receives dividend income from his equity interest in Vermont American.

7. The only member of the Board of Directors of Vermont American who ever voted differently from Lee Thomas was Ellen Dunbar; and she did so only twice. Thomas explains that he manages the company in keeping with the Quaker philosophy—by consensus. According to Thomas, although members of the Board frequently will disagree, issues are thoroughly dis-

---

**1.** Lee Thomas was also the President and Chief Executive Officer of the company. In 1984 he was replaced by Robert I. Baker, who has been in this position ever since and has no affiliation with the Thomas family.

**2.** These figures indicating beneficial ownership of Vermont American among the family members do not reflect the actual voting power. As

of June 1989, Lee Thomas owned about 20% of Vermont American's stock and had the right to vote a little over 30%; Glenn Thomas votes less than 2%; the Dunbar family votes about 13% of the voting stock and owned an additional 7% of the nonvoting Class B; and the Hamiltons owned less than 2%.

cussed and a consensus is reached prior to any formal vote.

8. The investment goals of the Thomas and Dunbar families have evolved over time. Lee Thomas and Glenn Thomas primarily were interested in a long-term investment in the company.[3] In late 1986, the Dunbars began considering the need to diversify their holdings. They have recently explored the possibility of selling all of their stock holdings in Vermont American. The Dunbars renewed their interest in selling their stock after Newell announced its tender offer and ultimately had direct discussions with Daniel C. Ferguson, Newell's Chief Executive Officer, about doing so.

9. Throughout its history, Vermont American has pursued policies and practices intended to achieve long-term profit maximization. Toward that end, the corporation has made substantial investments in research, development, plants and other physical assets, and in other measures designed to develop high quality products and services to customers, even at the cost of decreasing short-term value maximization.

10. Over the last five years, Vermont American has invested about 6.5% of sales in capital improvements. These policies have been beneficial; Vermont American has grown and prospered over the years. Net sales have grown at an annual compounded rate of 12.6% since 1973; operating income at 11.8%; and net income at 12.3%. The corporation's shareholders have reaped substantial benefits. An investment of $100 in Vermont American stock made on July 31, 1974 was worth approximately $2,646 on July 31, 1989.

### B. The 1987 Report of the Ad Hoc Committee

11. In late 1986, a special ad hoc committee of Vermont American directors was formed to consider the competing interests of the Thomas and Dunbar families, as well as general concerns with the growing takeover climate in the business community. The Board appointed Henning Hilliard, Robert Denison, Frank Furst and William Joseph Biggers to the committee[4]. None of these appointees was a member of management and none was related to any branch of the Thomas family. One concern of the committee was to assure that Vermont American remained an independent company.

12. The organizational meeting of the committee was held on December 30, 1986. The committee discussed at that meeting, among other matters, ways to accommodate the divergent family interests of the Dunbars and Thomases. One issue was the Dunbars' desire to liquify or diversify their stock and the potential impact such a sale might have on the long-term interests of the company and other shareholders. The committee expressed concern over how this potential sale might affect the Thomas family's longstanding control over the company since its founding and the ability of the company to remain independent from outside, hostile acquirors. The three committee members present at the meeting (Biggers was unavailable) concluded that they should retain competent investment advisors and independent legal counsel. They expressed no firm convictions as to how to solve the problems before them.

13. The committee retained Elliott Goldstein of the Atlanta law firm of Powell, Goldstein, Frazier and Murphy as legal counsel and Jay Levine of Dean Witter as investment advisor. Both men were chosen independently without Lee Thomas' assistance.

14. In January and February 1987, the committee met on at least four separate occasions and conferred with its profession-

**3.** Lee Thomas and various Board members testified they pursued long-term objectives for Vermont American. This does suggest different interests than those of the Dunbars, but I note Lee Thomas never defined his goals for the company.

**4.** Hilliard is an investment banker and former President of the New York Stock Exchange; Denison is a general partner at First Securities and a professor in the Graduate School of Business at Columbia University; Furst is Chairman of Furst–McNess Co. and serves as a director on several corporate boards; and Biggers is Chairman of the Board of American Business Products, Inc. a New York Stock Exchange Company.

al advisors. Many ideas for protecting Vermont American from hostile takeover were discussed tentatively, including issuance of super voting stock, eliminating cumulative voting, taking the company private, creating a shareholder agreement, and adopting a shareholder rights plan.

15. On February 20, 1987 the *ad hoc* committee issued its report and recommendations. The committee made eight recommendations. Of these, the Board ultimately rejected two outright: the proposal to convert Class B shares to Class A and the recommendation that the corporation obtain a right of first refusal on the converted Class B shares and provide for a transfer of that right to Lee Thomas at the company's option. The Board ultimately accepted in one form or another the committee's recommendation as to issuance of blank check preferred stock and the elimination of cumulative voting. Lee Thomas acknowledged that he supported issuance of preferred stock as a measure to assure that the current management continued to run the corporation. The authorization of blank check preferred and the elimination of cumulative voting were eventually approved by a vote of the shareholders.

16. The *ad hoc* committee never recommended and the Board never approved issuance of high vote common stock, taking the company private or any number of ideas that were floated, some of which appear in memos and notes created by committee members.

### C. *The Plaintiff*

#### 1. Newell Acquires a Stake in Vermont American

17. Newell Company is a Delaware corporation headquartered in Freeport, Illinois, which is engaged in the manufacture and marketing of consumer products for the do-it-yourself hardware/housewares market. In early 1986, Daniel Ferguson contacted Lee Thomas and proposed a business combination or other association between Newell and Vermont American.

18. No agreement was reached and Newell began to explore various strategies to acquire shares of Vermont American.

One alternative pursued by Newell in 1986 was the acquisition of an option to buy the shares held by the Dunbars and the Hamiltons. Newell engaged the investment banking firm of Wertheim Schroeder & Co. to assist it in that regard. Newell's efforts to acquire an option on the Dunbars' stock were not successful at this time.

19. In April 1988, Newell filed a Schedule 13D, announcing that it owned over 5% of the common stock of Vermont American. From the moment that Newell filed this Schedule 13D, the directors of Vermont American concluded that Newell's intent was hostile. The Thomas family was distressed at the news, believing that Newell would seek to acquire Vermont American and that they would lose control of the company.

20. Robert I. Baker, the President and a director of Vermont American, did not perceive Newell to be as threatening to the independence of Vermont American as did the Thomases. In a memo he sent to the company's division managers in July 1988, he noted that "over 54%" of Vermont American's stock was owned by insiders, and that the company had taken various measures to protect it from "unfair or coercive takeover tactics."

21. One week later Baker received a telephone call from another director of Vermont American, Ned Furst, reporting on a conversation Furst had had with Dan Ferguson. According to Furst, Ferguson had said that he felt it was impossible to take over Vermont American in light of the family ownership and that he had no intention of trying to take over the company. Ferguson said that his objective was to acquire 20% of the stock and get a seat on the Board so that Newell could use equity accounting for its investment in Vermont American. In addition, he said that he would be willing to accept a standstill agreement at 25%. Furst also reported the conversation to Lee Thomas. Furst told Thomas that given Newell's prior acquisition history its interest in Vermont American constituted "a serious situation".

22. In August 1988, Ferguson spoke with Lee Thomas, and repeated his propos-

als relating to gaining a significant equity interest in Vermont American and Board representation. At the same time, Ferguson formed the objective to swap Newell's stock in Thomas Industries, another Louisville-based firm founded by Lee Thomas, Sr., for its paint applicator business.

### 2. Vermont American's Response to Newell

23. After Newell filed its Schedule 13D, revealing its purchases of Vermont American stock, Vermont American's Board and management undertook to inform itself officially about Newell, its business, its business practices, and its reputation in the business community. In April 1988, Bear, Stearns & Co. ("Bear Stearns"), the investment bankers retained by the company, prepared a detailed report of Newell's prior acquisition history and strategies.

24. In addition to the Bear Stearns report, members of the Board relied on other sources to inform themselves about Newell. Some members of the Board had first-hand familiarity with Newell based on Newell's investment in Thomas Industries. Members of Vermont American's Board read and reviewed a report from Kidder Peabody to Thomas Industries that was consistent with the Bear Stearns profile of Newell. Furst also advised the Board that the Bear Stearns report was consistent with his own knowledge of Newell and Ferguson.

25. The Vermont American Board was aware that the primary source of Newell's profitability was through its successful acquisitions. Today Newell is the product of twenty-five acquisitions and these acquisitions generate about 90% of Newell's sales and profits. At times Newell had acquired public corporations at bargain prices through "creeping acquisitions" and two-tier tender offers. This was true, for example, in Newell's acquisition of Anchor Hocking Corporation in 1986. There Newell accumulated the company's stock and eventually acquired complete equity control of Anchor Hocking. In order to generate increased profitability Newell at times would follow its acquisitions by asset-stripping, plant closures and layoffs.

26. Newell had also acquired several companies in non-hostile transactions.

27. The Board's inquiry included examination of the contrasting corporate cultures and business philosophies of Vermont American and Newell. Newell is a marketing oriented company; its success is due primarily to acquisitions, not new product development or internal growth. It does not invest substantial amounts in new product research, development, or new plants and equipment. In the first quarter of 1989, for example, Newell spent $73 million acquiring companies and $3 million on capital investment. It has spent approximately 2.7% of sales on capital improvements as compared to 6.5% which Vermont American allocated to capital expenditures.

28. The Vermont American Board never met with Ferguson to discuss an association with Newell, nor did they seriously consider entering into an association with the company.

29. On August 17, 1988, the Board of Directors called a Special Meeting of Stockholders to amend the company's Certificate of Incorporation to eliminate cumulative voting for directors. Although the Board considered this proposal before Newell filed its 13D Statement, it was proposed at this time to prevent Newell from using cumulative voting to elect a representative to the Board. In September 1988 the Vermont American shareholders approved the elimination of cumulative voting.

### 3. Newell's Tender Offer and Vermont American's Response

30. Between April 1988 and June 1989, Newell slowly accumulated more Vermont American stock. On June 5, 1989 Newell announced that it owned about 11% of Class A Common Stock, and it announced a tender offer to purchase 1,200,000 additional shares or approximately 10% of Vermont American stock at $30.50 per share. If Newell acquired the full amount of stock it sought pursuant to its offer, it would own approximately 22.6% of the outstanding common stock of Vermont American. Newell stated that the purpose of its offer was "to acquire a more significant minority

position in the Company as an investment." Newell noted that it might be able to use the equity method of accounting for its investment if it owned 20% or more of Vermont American stock.[5]

31. Vermont American's directors were immediately notified of Newell's tender offer. The Board sought legal and investment banking advice before responding to Newell. It engaged investment bankers, Bear Stearns, and legal counsel, McDermott, Will & Emery. Representatives of both firms were present at the Board meeting held on June 13, 1989 to discuss Newell's tender offer.

32. The company's investment banker, Jeffrey Bloomberg, gave his opinion that the offering price of $30.50 per share, although greater than the price at which the stock traded, was less than the "enterprise value" of the company. Bloomberg did not give an opinion as to a fair price for a minority position in the company. Bloomberg advised the Board that Newell's tender offer, in all probability, was the opening line of attack in a takeover effort—similar to those Newell had pursued in other cases—designed to effect a creeping acquisition of Vermont American at a price below the company's "enterprise" value. Once again, Furst indicated that the pattern of creeping acquisitions described by Bear Stearns was consistent with his knowledge of Newell. In addition to hearing evidence of Newell's practice of creeping acquisitions and two-tiered tender offers, the Board received information about other situations in which Newell used a significant stock purchase to obtain a price for its shares not available to other shareholders.

33. Among the matters discussed at the meeting, with respect to which the Board received advice, were the financial and economic aspects of Newell's partial tender offer, the range of possible responses, Newell's history, business and acquisition practices, the obligations of the Board in responding to the tender offer, and various provisions in the corporation's charter, by-laws, corporate structure, and applicable law which would have or which were likely to have an impact on any attempt to acquire Vermont American.

34. The Board was advised that the nature of partial tender offers, such as Newell's, meant that even a shareholder who normally would not desire to sell his shares at the price offered by Newell could feel constrained to do so out of fear that a failure to sell could leave him as a minority shareholder in a company dominated and controlled by Newell. Such a shareholder eventually could be deprived entirely of his shares through a "back end" merger in which shareholders would receive less valuable consideration than the price offered under Newell's partial tender offer.

35. Bear Stearns cautioned the Board that if Newell obtained a foothold in Vermont American or board representation, it would jeopardize the long-term value of Vermont American's stock. If Newell succeeded, it could disrupt the business practices and methods of operation which had resulted in Vermont American's steady, sustained, and long-term growth, and could implement policies designed to generate short-term results without regard to long-term growth and development. At a minimum, with Newell owning 22% or more of Vermont American's stock and seeking to influence the company's affairs a potential existed for chronic conflict over Newell's short-term goals and strategy and the company's long-term business philosophies.

36. The Board was further advised by legal counsel that: a) it was the Board's fiduciary obligation to take measures to

5. Equity accounting is the method of accounting used for stock investments where the investor is able to influence significantly the operating and financial policies of a corporation. K. Larson & W. Pyle, *Fundamental Accounting Principles,* at 563 (11th ed. 1987). Equity accounting enables the investor to recognize the earnings of the investee corporation not only as an increase in the assets of the investee, but also as an increase of the investor's equity in the assets. *Id.* at 565. Generally, ownership of 20% or more of the voting stock of a corporation is presumptive evidence of the ability to exert significant influence over its operations and the investor may recognize earnings according to the equity accounting method. *FASB, Accounting Standards,* Nos. 182.104, 182.107–108 (Financial Accounting Standards Board 1988).

protect the corporation and all of its shareholders from any tender offer or takeover bid that it deemed to be contrary to the interests of the corporation and its shareholders and b) under Vermont American's charter—enacted in April 1981, well before the events at issue in this litigation—it was permitted to consider the interests of employees and customers of Vermont American, as well as the interests of the communities in which the corporation does business.

37. The directors then concluded that the company's "stockholders and other constituencies will be best served if the Company remains an independent entity" and that an "association" with Newell would not benefit Vermont American's shareholders.

38. On June 15, 1989 Vermont American filed with the SEC its Schedule 14D-9 form. Although the directors themselves would not tender their shares, this Schedule announced that the directors had "determined to make no recommendation as to whether stockholders should sell or retain their shares" pursuant to Newell's tender offer.

39. Notwithstanding their claim of neutrality, the directors were unanimously opposed to Newell's tender offer. The directors began exploring methods to assure that the current Board remain independent of Newell. Three strategies were adopted that were intended to obstruct Newell's tender offer. First, the Board directed management immediately to begin repurchase of the corporate stock. This worked both to give shareholders an alternative to Newell's offer and to decrease the amount of stock available for Newell. Second, the Board structured the proposed acquisition of Clairson International Corporation so that any stock issued in connection with this transaction would "be controlled by the Company as to voting and transfers for some period of time." Third, the Board lowered the trigger on an existing Shareholder Rights Plan from 27% to 15%.

#### a) The Stock Repurchase Program

40. Vermont American had in place since October 1987 a repurchase program that was reviewed by the Board annually. The Board approved stock repurchases in response to the recent stock market crash. The most recent program, reviewed and reaffirmed in October 1988, authorized the Board to repurchase up to 1,000,000 shares (later adjusted for stock dividends to 1,100,-000 shares). Management was authorized to repurchase stock from time to time based upon various factors including stock price, effect on long-term shareholder values, availability of stock, and the possibility of better investments elsewhere.

41. On June 13, 1989, acting upon Bear Stearns' advice, the Board concluded that continuing with share repurchases constituted a reasonable and prudent investment for the corporation because it would: (1) benefit selling shareholders by offering them an opportunity to sell all their shares without risk of proration or of Newell's exercising of its right to withdraw its partial tender offer; (2) benefit non-selling shareholders who wished to maintain a long-term investment in Vermont American by reducing the specter of a Newell takeover, and the consequent corporate disruption that the Board perceived would ensue; (3) benefit the corporation by preventing a disruptive influence from achieving a significant control position; and (4) enable the company to follow Bear Stearns' advice to increase leverage and, by taking additional debt, to increase earnings per share for shareholders who did not wish to sell.

42. At the suggestion of Lee Thomas, the Board limited the repurchases to no more than approximately 300,000 shares unless further, specific authorization from the Board was obtained. The Board was to be informed fully of the company's repurchases. The repurchases were to be made at or close to the market price with close guidance from legal counsel. The Board further instructed Bear Stearns to report back with further studies analyzing the financial aspects of the repurchase program and other available alternatives. The Board asked Bear Stearns to prepare financial projections regarding the repurchase

program based on the most extreme economic possibilities.

43. After the Board's actions on June 13, the company filed a Schedule 14D–9 and a Rule 13e–1 Transaction Statement as required under the federal securities laws. The only reason given in this statement for the repurchases is that the shares "will be held in the corporate treasury to be used for corporate purposes." The press release issued by Vermont American on June 15 stated as follows:

Vermont American Corporation announced that its Board of Directors met with Bear, Stearns & Co., its investment bankers, to consider the tender offer of Newell Co. for 1.2 million shares of Vermont American's Class A Common Stock. In view of Vermont American's past growth record and its current condition and business prospects, the Board concluded that the Company's future is good and that its stockholders and other constituencies will be best served if the Company remains an independent entity. None of the directors will sell any of their shares in the tender. The Board has no recommendation as to whether other stockholders should sell or retain their shares.

The Company also announced that it is filing a 13e–1 statement with the SEC to permit the resumption of its previously authorized Class A Common Stock repurchase program. That program, announced on October 28, 1988, covered the repurchase of up to 1,100,000 shares, of which 84,647 shares have previously been repurchased. All repurchases have and will be made on the American Stock Exchange or in privately negotiated transactions out of the Company's own financial resources including its previously existing credit lines. The shares will be held in the corporate treasury to be used for corporate purposes.

44. On June 15, one director, John Leahy, suggested to Ned Furst that they create a special committee of independent directors, consisting of themselves, Ken Hirsch and Joe Biggers, to separately assess the threat posed by Newell and to evaluate the proper response. As in 1987, this committee hired its own counsel, Elliot Goldstein, and investment banker Jay Levine of Dean Witter Reynolds. Ken Hirsch is President of Paramount Foods Co. in Louisville, Kentucky. John Leahy is Chairman of the Board of Master Power Corporation and was former President of the North American division of Black & Decker Manufacturing Company. He was recommended to the Vermont American Board by Robert Baker.

45. During the June 22 meeting, Bear Stearns presented the Board with projected financial statements and summary statements which compared the impact of various buyback proposals on the company's capital structure, debt coverage ratios, and earnings per share under both pessimistic and realistic assumptions. Those studies showed that the expansion of the share repurchase program would be financially beneficial to Vermont American. It would increase earnings per share and give the company certain tax advantages by shifting some of the company's capitalization, on which dividends are paid, to debt, on which interest may be deducted. Bear Stearns also provided the Board with information about various means by which the expanded share repurchases could be accomplished, including the issuance of put rights to all existing shareholders, a dutch auction, and private transactions.

46. The Board, following Bear Stearns' recommendation, authorized the repurchase of up to an additional 1,100,000 shares to give the company greater flexibility in the emerging situation. This recommendation was discussed and was approved by the Board, subject to the caveat that no more than an additional 300,000 shares be purchased without further study and proposals being brought back to the Board.

47. Bloomberg urged the Board to expand the repurchase program so that the company would have the utmost flexibility to deal with the fluid situation created by Newell's tender offer and to provide a cushion for the market price of the shares if Newell precipitously terminated its high-

ly conditioned offer or dumped its shares on the market.

48. The committee of independent directors of the corporation met on June 22, 1989 and separately and unanimously approved the expanded authority for the repurchase of shares. Prior to voting, the independent directors consulted with their own lawyer, and examined the company's financial forecasts, the long-range future of the company, the benefits of the repurchase program to both selling and remaining shareholders, and the dangers posed by Newell's hostile, partial tender offer. At the time it doubled the repurchase program, Vermont American did not have any existing or planned corporate purpose for the stock it was going to repurchase, but the Board did believe that this was a financially prudent course of action.[6] On June 22, 1989 Vermont American filed with the SEC an amendment to its Schedule 14D–9. In this document, the directors elaborated upon their response to Newell's tender offer, stating that they:

did not have a sufficient basis for a recommendation, believing that it was the type of offer that each stockholder should respond to in the light of his or her own circumstances, financial or otherwise.

49. Notwithstanding the sound financial basis articulated for resumption of the share repurchase program, a primary motivation for the Board action at this time was to frustrate Newell's tender offer. Between October 1988 and June 14, 1989, Vermont American repurchased only 84,647 shares out of the 1,100,000 shares it was authorized to repurchase. The highest price paid for any of these shares was $26.75. One of the reasons that Vermont American repurchased only 84,647 shares was that the prices were too high. Between June 15 and June 30, 1989, however,

Vermont American repurchased 345,458 shares of its common stock at prices ranging up to $31.00 per share. This stock was not needed for any existing or planned corporate purposes, since Vermont American already had 835,331 shares in its treasury before it resumed its repurchase program on June 15, 1989. The prices paid by Vermont American in June of 1989 to repurchase its stock were the highest prices at which Vermont American's stock had ever traded. If Vermont American obtained all the shares it authorized the combined interest of the Thomas and Dunbar family would exceed 50%.

50. The next Board meeting was held on June 28, 1989. One director, Furst, noted that Bloomberg had recommended that the Board not endorse Newell's tender offer; instead, Bloomberg urged the directors to use an "aggressive" repurchase program. Furst's notes also attribute to Lee Thomas the statement that "we need to be certain we control—we can forget about Newell." Another director, Hirsch, noted: "Screw Newell—go get the shares."

51. At least one director expressed concern that the measures being taken by Vermont American were devices to entrench management. The other directors and management, however, believed that they had two priorities: "Take control" and "Stop Newell." Bloomberg recommended that the Board meet with Newell, but the Board refused to do so.

52. Bloomberg previously had represented Newell and was acquainted with Dan Ferguson. After the June 22, 1989 Board meeting, Bloomberg contacted Ferguson to "open a dialogue" between the two companies. Ferguson stated that he wanted to achieve equity accounting. Bloomberg responded that a long-term standstill agreement coupled with one

---

**6.** The press release issued by Vermont American on June 22, 1989 stated the following:

Vermont American Corporation (AMEX) announced that its Board of Directors had authorized the acquisition by the Company of up to 1,100,000 additional shares of its stock either under its previously announced open market repurchase program or other means as yet undetermined. The program originally covered 1,100,000 shares for purchase on the open market or in privately negotiated transactions. To date, 325,686 shares have been so acquired. The Company's management and its advisors have been asked to study alternatives as to the future acquisition of the 1,872,314 shares remaining in the expanded program and to make recommendations to the Board.

Board member acceptable to both parties, joint marketing and/or a position on an advisory board might accommodate both parties. When Ferguson responded to Bloomberg, he increased Newell's demand to a 19% stake in the company, two board seats and a three year standstill agreement. Bloomberg concluded that Ferguson could not be accommodated and that his interests went beyond mere association. He reported his conversations and conclusions to the Vermont American Board on June 28, 1989.

53. On June 29, 1989 Newell brought suit seeking to enjoin the share repurchase program. On June 30, 1989, after a hearing, this Court issued an order restraining further purchases pursuant to the share repurchase program. The Court conditioned this restraining order upon Newell's not purchasing shares under its tender offer. The share repurchase program was terminated by the Board on July 12, 1989, in light of the Board's decision to authorize management to explore a possible sale of the company. As of the time of termination, the shares purchased between the June 13, 1989 authorization and termination increased the number of shares voted by Lee Thomas by less than 1%.

### b) The Clairson Transaction

54. Clairson International, Inc. is a Florida corporation engaged in the design, manufacture and sale of welded wire home shelving and storage products. Approximately 57.5% of Clairson's stock is owned by Norman O. and Donald P. Sauey. The rest of the stock is publicly owned and traded on the NASD Automated Quotation System.

55. Beginning in at least the Fall of 1988, members of Vermont American's management discussed the possibility of a business combination with Clairson. Vermont American's management believed that Clairson's business would be a desirable acquisition for Vermont American and would complement the other products Vermont American manufactured. Historically Vermont American had acquired other entities through cash deals.

56. Beginning prior to April 18, 1989, negotiations with respect to the acquisition of Clairson by Vermont American took place. A merger agreement was entered on July 1, 1989.

57. A corporation formed by Newell also was pursuing an acquisition of Clairson. On April 24, 1989 that corporation announced publicly that it had made an offer to acquire Clairson. Prior to that date, Newell's interest in acquiring Clairson was not known to Vermont American.

58. The Clairson deal was originally proposed as a cash deal. In the initial stages of negotiations for the acquisition of Clairson, Vermont American considered using non-voting stock as part of the consideration to be paid for Clairson. After Newell announced its tender offer, however, Vermont American chose to issue voting stock which, by agreement, would be voted in accord with the recommendations of the Board of Directors of Vermont American. Lee Thomas was not enthusiastic about the Clairson acquisition until it was proposed that the Board of Vermont American would have control over the voting of the Saueys' shares in Vermont American.

59. The Saueys preferred that their Clairson stock be purchased for stock so that the transaction could be tax free to them and they would have an equity interest and potential upside in the acquiring company. However, the Clairson acquisition was structured as an Internal Revenue Code Section 368(a)(2)(D) reorganization. As such, it did not require the use of voting stock, and the tax consequences would have been the same if non-voting stock had been used.

60. The use of voting stock in payment to the Saueys was in response to what Vermont American perceived as attempts by Newell to gain control of Vermont American.

61. Under the merger agreement the stock to be issued to the Saueys is voting Convertible Preferred Stock. The Saueys will receive 755,883 shares of Convertible Preferred Stock or equal to approximately 7% of Vermont American's voting stock on

a diluted basis. Lee Thomas' voting power will be lowered from about 30% to 28%. If issued, the stock will be subject to an agreement under which it will be voted for ten years in accordance with the recommendations, if any, of Vermont American's Board. If the Saueys sell their stock, the voting agreement lapses.

62. Approval of the Clairson transaction was given by the Board on June 22, 1989. In the course of that meeting, the independent directors met separately and approved the transaction based on the business benefits and synergies provided by the proposed combination of the two companies.

63. On June 29, 1989, the independent members of the Vermont American Board, meeting separately in a telephone meeting as a special committee, considered the terms of the Convertible Preferred Stock called for under the proposed merger agreement, including the provisions with respect to the voting of that stock. After a presentation by Elliot Goldstein, the independent legal counsel specifically retained by the committee, the committee concluded that the voting agreement was in the best interests of the corporation. The issuance of the preferred stock was approved by the entire Board, later, on June 29.

64. The special committee of independent directors recommended to the Board on July 11, 1989 that if Convertible Preferred Stock ever is issued to the Saueys as called for under the merger agreement, it should be voted in accordance with the recommendations, if any, of the committee of independent directors instead of the entire Board's recommendations. The special committee's recommendation for the transfer of authority was approved and implemented by the entire Board on July 12, 1989. One director, Ellen Dunbar, testified that she was unaware of the transfer of voting control before this lawsuit. Nothing prevents the Vermont American Board from revoking this transfer of authority.

65. The Clairson merger agreement has not yet been submitted to the shareholders of Clairson for their approval, and no Vermont American stock has been issued as a result of that transaction. No vote of Vermont American's shareholders has been scheduled or is imminent.

### c) The Rights Plan

66. On July 12, 1989, the directors of Vermont American amended the existing Shareholder Rights Plan [7] to lower the trigger on the Plan, upon an acquisition of stock, from 27% to 15% for a period of 120 days. A press release was issued announcing the change in the Rights Plan and that the Board was exploring a possible sale of the company. The press release issued by Vermont American on July 12, 1989 stated the following:

LOUISVILLE, KY., July 12, 1989— Vermont American Corporation (AMEX) announced that its Board of Directors has authorized management to explore a possible sale of the Company. In this regard, the Board has retained Bear Stearns & Co. to act as the Company's financial advisor and to enter into discussions with qualified prospective purchasers. The Board has not made a final decision to sell the Company and there can be no assurance that any transaction will result from these discussions. At the same time, the Board terminated Vermont American's previously announced stock repurchase program and made temporary amendments to its shareholder rights plan.

The stock repurchase program was for up to a total of 2,200,000 shares, of which 430,105 shares had been repurchased since the original adoption of the program in October of last year. The rights plan amendments lowered the percentage ownership of Vermont American Class A Common Stock that triggers the rights to 15% and eliminated the 20–day

---

7. On February 17, 1988, Vermont American had adopted a Stockholder Rights Plan, more commonly known as a "poison pill." According to the agreement, the pill would be triggered once an "Acquiring Person" becomes the beneficial owner of 27% or more of the common stock of which 10% or more was acquired after February 17, 1988. The definition of an Acquiring Person includes Newell, which did not reach 10% stock ownership until after February 18, 1988, but excludes Lee Thomas, who exceeded the 10% plateau prior to that date.

window permitting redemption of the rights after a triggering event. These amendments are intended to protect the Board's ability to manage the exploration of the sale of the Company. These amendments will terminate and the rights plan will revert to its prior form at the end of 120 days unless contract for the sale of the Company is entered into during that period, in which event the amendments will continue in force until such agreement has been completed or terminated.

Robert I. Baker, President and Chief Executive Officer, of Vermont American commented with regard to the Board's action: "The Board has decided to explore the possibility of a transaction that will enable all stockholders to better realize the value accumulated in the Company. In addition, in this process, and consistent with our obligations, we will seek to preserve the relationships Vermont American has enjoyed with its employees, customers, suppliers and local communities over the years." ...

Bear Stearns had recommended that the Board temporarily lower the "trigger" of the Rights Plan for a period of 120 days, the anticipated length of the period during which the Company was to explore the possibility of a sale.

67. The amendment to the Stockholders Rights Plan was prepared by the law firm of McDermott, Will & Emery, which represents Lee Thomas. Legal counsel advised the Board regarding its fiduciary obligations and advised that as a means of facilitating a possible sale of the company, the proposed 120 day lowering of the trigger recommended by Bear Stearns to provide a level playing field was a reasonable corporate action which would maximize shareholder value for all shareholders.

68. At the meeting at which the Vermont American Board amended the Rights Plan, neither the amendment nor a written description was given to the Board of Directors.

69. The effect of this amendment was that the amount of stock which Newell could purchase without triggering the pill was reduced to about 4% of the outstanding stock while Lee Thomas and his son could each acquire an additional 9% of the outstanding stock without triggering the pill. The original draft of the amendment proposed lowering the trigger only to 20%, a level which might have allowed Newell to obtain equity accounting.

D. *Termination of Newell's Tender Offer and Vermont American's Decision To Sell*

70. Newell's tender offer was scheduled to expire at midnight Friday, June 30, 1989. Although Newell had until 9:00 a.m. on Monday, July 3, 1989 to inspect the shares and announce its intentions concerning its tender offer, at 11:03, June 30, Newell issued a press release stating that it would terminate or extend its tender offer and that it would announce its decision later that day. This announcement gave notice to the market that Newell would not take down tendered shares on June 30 and effectively cut off the possibility of further tender.

71. The great majority of shares tendered in a tender offer come in on the last day, after 5:00 p.m. Newell announced its decision to terminate the tender offer early in the evening of June 30 at a time when the noon figure for tendered shares was the last available information.

72. As of noon, Chicago time, on June 30, 1989, 260,585 shares of Vermont American stock had been tendered to Continental Bank, the depository for Newell's tender offer; 46,427 of those shares had been examined and approved. Later, on June 30, Continental Bank had approved the tender of a total of 171,015 shares, and a total of 179,796 additional shares had been submitted to, but not yet been examined by, Continental Bank. Following the termination of Newell's tender offer, Continental Bank continued to receive notice of additional tenders of stock for approximately one week. There is no complete record of the number of shares so tendered. Continental's best "guess" is that 475,000 to 500,000 shares were tendered. Under its tender offer, Newell could have purchased

fewer than all of the shares which it offered to buy.

73. Pursuant to the terms of this Court's restraining order, Newell terminated its offer and did not purchase any shares. Ferguson testified that he terminated the tender offer without waiting to see how many shares would be tendered because it was his understanding that he could not buy the Dunbar shares without first terminating the tender offer. Discussions with the Dunbars began immediately following the termination.

74. Had Ferguson purchased the Dunbar block, he would have owned approximately 24% to 33% of Vermont American stock and apart from Lee Thomas, would be the only other large shareholder in Vermont American.

75. Prior to Newell's commencement of its tender offer on June 5, 1989 Vermont American stock was trading at just under $26.00 per share. Announcement of the tender offer was followed by an immediate jump to 29¾.

76. Between the time Vermont American announced its repurchase plan, on June 15, 1989, and June 22, 1989 when it issued a press release announcing the doubling of the authorization, the stock price hovered at the $30.00 mark.

77. Between June 22, 1989 and this Court's June 30 Order, the stock price moved between $30 and $31. During the life of the June 1989 repurchase plan, all trading in Vermont American shares totalled approximately 400,000 shares. Thus, the great majority of Vermont American shareholders held on to their shares.

78. On July 12, 1989, the Vermont American Board approved a resolution authorizing management to explore a possible sale of the entire corporation. The resolution was approved after the Board considered all available options; statements were made by Lee Thomas and Ellen Dunbar concerning their intentions with respect to the retention of their stock; the likelihood that the sale of substantial blocks of stock by major shareholders would pose a threat to the corporation's continued independence; and the advice of investment bankers that even though the company could prosper if it remained independent, the interests of all shareholders would be served best by a sale of the entire company in which all shareholders are treated equally, rather than by the separate sale of major blocks of stock. Bear Stearns was engaged to advise the company with respect to the solicitation of offers from potential bidders.

79. Lee Thomas and Ellen Dunbar expressly have stated that they support the process of exploring the possibility of a sale of the company in their capacities as shareholders.

80. At the July 12 Board meeting, Bear Stearns advised the company that the process of exploring a potential sale probably could be completed within a 120 day period. For the sale process to achieve maximum potential for its success, however, Bear Stearns emphasized that the Board must maintain a "level playing field" for all potential bidders and avoid the formation of additional large blocks of Vermont American stock. Specifically, Bear Stearns advised the Board that if Newell renewed its tender offer or if it made open market purchases and acquired more than 15% of Vermont American's stock, Newell could utilize its stock as a "blocking position" to prevent or hinder the sale of the company to any other bidder.

81. Newell has been offered the opportunity to purchase on the same basis as all other potential acquirors in the sale process, but has not taken any steps in that direction.

82. On September 28, 1989, Vermont American issued a press release stating that it had entered into a merger agreement with Emerson Electric Company and Robert Bosch GmbH. A new corporation, Maple Acquisition Corporation, will be formed by Emerson and Bosch which will acquire Vermont American for approximately $440 million. Under the agreement Maple Acquisition will commence a tender offer which will be made for all Vermont American shares at $40.00 per share in cash, subject to upward adjustment to a

maximum of $41.00 depending upon the resolution of this litigation. The tender offer will be followed by a merger between Vermont American and the acquisition company in which any of the remaining shareholders will receive the same price as paid in the tender offer for their stock.

### E. Vermont American's Counterclaim

83. In early 1986, Daniel Ferguson initiated discussions with Vermont American to explore specifically the possibility of a combination between Vermont American and Newell. Ferguson proposed no passive investment or minority equity position. Disclosure of these contacts was omitted from Newell's Schedule 13D filed on April 6, 1988 and they were not revealed publicly until Newell filed amendment no. 1 to Newell's Schedule 13D on June 15, 1988.

84. Only after Newell's proposal was rebuffed did Newell begin its accumulation of Vermont American stock.

85. Newell contacted its principal investment banker, Wertheim Schroeder & Co., in 1986 to consider the acquisition of stock in Vermont American. As a first step, Newell instructed Wertheim to attempt to get an option on family-held blocks.

86. Though Newell says that it subsequently retained Rothschild, Inc., specifically and for the limited purpose of assisting in Newell's tender offer, Rothschild prepared for Newell a memorandum devoid of reference to equity accounting and minority positions as early as October 1987. The memorandum catalogued issues addressed in connection with efforts to obtain equity control. Notably, Rothschild listed Vermont American's anti-takeover measures and compiled a list of potential acquisition issues. The memorandum also included an analysis of the maximum price Newell would pay in an equity acquisition. This product from Rothschild is not surprising and cannot necessarily be attributed to an all-consuming desire by Newell to acquire other companies. Rothschild is also motivated by profit-making and stands to gain if Newell makes an acquisition upon their recommendation.

87. Just prior to filing its initial Schedule 13D, Newell received a report prepared by Salomon Brothers discussing acquisition candidates for Newell, including Vermont American. Ferguson said that although he threw away the rest of the report, he held on to this one and relied on it in making decisions to acquire more stock in Vermont American.

88. On April 6, 1988, Newell disclosed that it owned in excess of 500,000 shares, or approximately 5.5% of the outstanding Vermont American stock. These shares had been accumulated through market purchases over a period of nearly two years. In its Schedule 13D, Newell stated that its only purpose was investment.

89. Newell amended its Schedule 13D twice in 1988. On neither occasion did it alter in any way its previously stated purposes and intentions regarding Vermont American. Rather, it continued to maintain that it had purchased the shares solely "for investment" and that it "[did] not presently plan to become actively involved in the management of the Company." Newell did not reveal that it sought to exert substantial influence over the business operations of Vermont American. Although implicit in the desire to achieve equity accounting is the ability to exert influence over the corporate operation, this is not necessarily the same objective as actually seeking control or board representation for the purpose of exerting control over the corporation.

90. Newell never amended its Schedule 13D to reflect Ferguson's two conversations with Ned Furst—one in April 1988 and the other in July 1988—in which he articulated his desire for Board seats or his similar discussions with Lee Thomas in August 1988.

91. On March 2, 1989, Newell again amended its Schedule 13D to reflect ownership of more than 10% of the outstanding voting stock of Vermont American, of which 500,000 shares were purchased at prices 25% below the current market. No change in Newell's "investment only" purpose was expressed.

92. When Newell commenced its tender offer for Vermont American stock on June 5, 1989, seeking to raise its stake to over 20%, the company continued to maintain that its ownership purpose was solely "for investment."

93. For the first time, in its combination amendment no. 4 to its Schedule 13D and 14D–1 tender offer, Newell publicly acknowledged that ownership of 20% or more of Vermont American's stock "may make it appropriate for [Newell] to account for its investment in [Vermont American] using the equity method of accounting." But Newell still did not disclose that it sought to obtain Board representation and that its other goals were an association or combination of the companies.

94. During the pendency of Newell's tender offer and shortly after Newell terminated its tender offer, Newell negotiated with the Dunbars in an effort to buy the Dunbars' substantial block of Vermont American stock. These facts were never disclosed in Newell's amendments to its Schedule 13D or in any other way.

95. During the pendency of Newell's tender offer, Ferguson also spoke with Bloomberg and reiterated his intention to obtain board seats. These facts were never disclosed in Newell's amendments to its Schedule 13D.

96. In an affidavit attached to Newell's Hart–Scott–Rodino Notification and Report Form, filed on July 6, 1989, William Alldrege, Newell's chief financial officer, stated that Newell had a definite intention to purchase in excess of 25% of the stock of Vermont American.

97. On July 10, 1989, Newell again amended its Schedule 13D and still did not disclose any control objective and its intent to acquire more stock in Vermont American. Newell asserted that the association of the two companies that would result from a more significant minority position could be "beneficial", and continued to cite only the equity method of accounting as a

possible outcome of its increasing ownership.

98. On August 4, 1989, Newell filed its amendment no. 7 to its Schedule 13D in which it stated that Newell's "primary objective continues to be to acquire a more significant equity interest in [Vermont American] and to obtain representation on the Board of Directors." Newell further disclosed in amendment no. 7 that its purpose had been to put itself in an ownership position that "gives it the ability to exercise significant influence over operating and financial policies of [Vermont American]."

## II. ANALYSIS, CONCLUSIONS OF LAW AND FURTHER FINDINGS OF FACT

### A. *Jurisdiction and Standing*

1. Jurisdiction is appropriate in this Court with respect to Counts I–IV alleging violations of various provisions of the Williams Act (codified at 15 U.S.C. secs. 78m(d)–(e), 78n(d)–(f), at 15 U.S.C. secs. 78m(d)–(e), 78n(d)–(f)), and Count VI, a pendent state law claim, alleging breach of fiduciary duties by the Vermont American Board.[8]

#### 1. Injury Alleged

■ 2. Under Delaware law a shareholder may bring an individual action where there is "an injury which is separate and distinct from that suffered by other shareholders." *Moran v. Household Int'l, Inc.*, 490 A.2d 1059, 1070 (Del.1985). If the cause of action is based on unlawful acts affecting only the stock owned by the plaintiff, an individual action is appropriate. Where, for example, the shareholder is denied a contractual right attaching to his or her ownership, such as the right to vote or to inspect the corporate books, there exists an individual action. Fletcher, *Cyclopedia Corporations* sec. 5915, at 440.

Essentially the complaint alleges that the Vermont American Board breached certain fiduciary duties and failed to fulfill certain disclosure requirements under the Securi-

---

**8.** Count V alleges a claim under section 9 of the Securities and Exchange Act of 1934. Newell lacks standing to bring this claim because Newell was neither a purchaser nor seller of securities. Also, plaintiff now does not pursue this claim.

ties Exchange Act of 1934, 15 U.S.C. secs. 78a *et seq.* Because of the Vermont American Board's actions, Newell was neither able to obtain 20% of Vermont American's stock through its tender offer nor use the equity accounting method with respect to its investment in Vermont American. Newell, along with all the other shareholders of Vermont American, was prevented from acquiring some stock because of the Board's repurchase program. Similarly, all shareholders were affected by the modified Rights Plan and the Clairson transaction.

Newell argues that it has an injury distinct from other shareholders because it alone sought a certain percentage of Vermont American's stock in order to utilize the equity accounting method with respect to its investment. Shareholders, however, have no independent right to equity accounting, as they are not guaranteed the right to a particular accounting method when investing in a corporation. If, in fact, the Vermont American Board did breach its fiduciary obligations to the shareholders, Newell was not denied "differently" from any other shareholder. Perhaps if Newell already accounted for its investment in Vermont American by the equity method and the Board's actions disturbed this practice, Newell would have a better claim to an individual injury.

3. Neither does Newell have an individual claim in its capacity as a tender offeror for the Board's breach of fiduciary duties. Established precedent is that a board owes no duty to a tender offeror. *Moran*, 490 A.2d 1059. *See also Crane v. Harsco Corp.*, 511 F.Supp. 294, 304 (D.Del.1981) ("the 'right' to make a tender offer is not a contractual right owed to the shareholder by the corporation ..." and tender offeror's complaint that the repurchase program frustrated its tender offer "is not a sufficient basis for an individual action under Delaware law").

■ 4. A shareholder must bring a derivative action, in the name of the corporation, when the injury complained of is common to all shareholders. Newell's complaint does state a derivative cause of action. Assuming that the well-pleaded facts of the complaint are true, as I must, the allegations raise reasonable doubt that the Board's action was: a) independent and disinterested and b) otherwise the product of a valid business judgment. Demand would be futile if, in fact, the Board did act to entrench itself, and is properly excused. *Starrels v. First National Bank of Chicago*, 870 F.2d 1168, 1170 (7th Cir.1989) (whether plaintiff was required to make a demand to the board prior to bringing suit is an issue left to the discretion of the district court). *See also* E. Folk, R. Ward, Jr. & E. Welch, *Folk on the Delaware General Corporation Law* sec. 327.4, at 363 (2nd ed.1988).

■ 5. Defendant questions Newell's ability to represent adequately the shareholders in a derivative suit. Derivative suits are governed by 8 Del.Code sec. 327 and Ch. Ct. Rule 23.1 under Delaware law.[9] It is implicit in these rules that the plaintiff must adequately and fairly represent the interests of the shareholders. *See* E. Folk, R. Ward & E. Welch, *Delaware General Corporation Law* sec. 327.3.3, at 359 (1988). *See also Youngman v. Tahmoush*, 457 A.2d 376, 379 (Del.Ch.1983). A shareholder need not necessarily be disqualified from bringing a derivative action against the corporation merely because that shareholder is also the potential acquiror. *MacAndrews & Forbes Holding Co., Inc. v. Revlon*, C.A. No. 8126, slip op., 1985 WL 21129 (Del.Ch. Oct. 9, 1985). To be disqualified defendant must show that the plaintiff-representative's interests are intrinsically at variance with those of the other shareholders. *Youngman*, 457 A.2d at 381.

■ The reviewing court may look to extrinsic factors to determine the adequacy of representation. The most important consideration should be antagonistic eco-

---

**9.** We consider this claim under Delaware law. When a federal court exercises jurisdiction over claims arising from state law, state substantive law must be applied to resolve the claims. *Marathon Petroleum Co. v. LoBosco*, 623 F.Supp. 129, 134 (N.D.Ill.1985) (citing *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966)).

nomic interests. *Owen v. Modern Diversified Industries, Inc.*, 643 F.2d 441, 443 (6th Cir.1981). Newell's claims here indicate that it is interested, like other shareholders, in maximizing the value of its investment and insuring that management does not manipulate the corporate machinery for improper purposes. Simply because there is some evidence that Newell may have been interested in attaining control of the corporation does not put it at variance with the other shareholders. *See ALPA, Int'l v. UAL Corp.*, 717 F.Supp. 575, 579 (N.D.Ill. 1989). Newell is a proper representative of the shareholders in a suit putting the Vermont American Board's activity at issue.

### 2. Williams Act Claims

 6. Newell complains that Vermont American violated the Williams Act by failing to make proper disclosures under Rules 13e–1, 14e–2 and 14d–9 of the Securities Exchange Act 1934. Rule 13e–1 requires that an issuer who purchases its own stock during a tender offer identify "the purpose for which the purchase is to be made and whether the securities are to be retired, held in the treasury of the issuer or otherwise disposed of, indicating such disposition." Newell argues that Vermont American's disclosure that it was repurchasing stock to be "used for corporate purposes" violated the statute because, in fact, Vermont American was repurchasing shares in order to defeat Newell's tender offer.

Rules 14e–2 and 14d–9 required that Vermont American disclose to its shareholders whether it recommended acceptance or rejection of Newell's tender offer or expressed no opinion toward it. Newell claims that the Board misled Vermont American shareholders by stating that it had no recommendation regarding Newell's tender offer, thereby implying its neutrality, when it actually was taking actions to oppose the tender offer. Before reaching the substance of these arguments, however, I consider whether Newell has standing under the securities laws to bring these claims.

7. Congress enacted the Williams Act in 1968 in response to the proliferation of cash tender offers as a means to effectuate corporate takeovers. *Rondeau v. Mosinee Paper Corporation*, 422 U.S. 49, 95 S.Ct. 2069, 2976, 45 L.Ed.2d 12 (1975); *Indiana National Corporation v. Rich*, 712 F.2d 1180, 1183 (7th Cir.1983). Although corporate acquisitions by proxy statements or by exchange offers were subject to registration and disclosure requirements under existing federal securities laws, *see* 15 U.S.C. secs. 78n, 77e, tender offers or acquisitions of substantial amounts of stock having a potential for control were unregulated until the Williams Act was adopted. The purpose of these amendments was to insure that public shareholders, forced to make a decision regarding the ownership of their shares in light of a tender offer or an acquisition by a third party of a large block for shares, possibly involving a contest for control, are adequately informed regarding the qualifications and the intentions of the party. *Piper v. Chris–Craft Industries, Inc.*, 430 U.S. 1, 97 S.Ct. 926, 939–940, 51 L.Ed.2d 124 (1976). Congress' intent was that the legislation neither favor management of the company nor outside bidders. *Id.* 97 S.Ct. at 943.

Although the statute is silent with respect to the availability of a private remedy under the antifraud provisions such as those expressly provided in other sections, *e.g.*, secs. 11, 12, 15 of the Securities Act of 1933 and secs. 9, 18, 20 of the 1934 Act, the United States Supreme Court has implied a private cause of action in some circumstances. *E.g.*, *Rondeau*, 95 S.Ct. 2069 (Supreme Court indicated that a target company may have standing to complain of delays by a purchaser in filing a Schedule 13(D)); *Piper*, 97 S.Ct. 926 (Supreme Court found that a competing offeror cannot maintain a private right of action under section 14(e), but the Court expressly did not rule out a private remedy); *Rich*, 712 F.2d 1180 (private right of action for injunctive relief available to issuer corporation under 13(d)); *Humana, Inc. v. American Medicorp, Inc.*, 445 F.Supp. 613 (S.D. N.Y.1977) (held that a competing tender offeror had standing to sue target management for injunctive relief under the Williams Act).

In *Piper* the Supreme Court specifically rejected the notion that a competing tender offeror like Newell would have a private cause of action for damages. The Court indicated that such a remedy would neither be compatible with the purposes of the Williams Act, nor would it be consistent with Congress' intent in enacting the statute. After noting that the purpose of the Williams Act was to insure that public shareholders confronted with a cash tender would not be required to respond without adequate information, the Court noted:

> [w]e find no hint in the legislative history ... that Congress contemplated a private cause of action for damages by one of several contending offerors against a successful bidder or by a losing contender against the target corporation.

*Piper*, 97 S.Ct. at 946. The *Piper* Court explicitly left open the issue of whether a competing tender offeror had a private right of action for injunctive relief under the antifraud provisions. Although the Supreme Court did not indicate the precise scope of the *Piper* decision, it is clear that the purpose of the Williams Act was to increase investor protection by serving the shareholders of the target company, and not competing tender offerors who, at best, were incidental beneficiaries of the tender offer provisions. *See* T.L. Hazen, *The Law of Securities Regulation* sec. 11.19, at 375.

I do not reject the notion that a bidder corporation may in certain circumstances act on the shareholders' behalf to insure that an even playing field is maintained between incumbent management and the parties thought to be seeking control. As the Seventh Circuit noted when finding that a target corporation had a private right of action under Section 13(d), the manner in which the Williams Act is meant to provide protection to shareholders is by "generating a 'fair fight'" between the acquiror and target management, "[y]et the shareholders have neither the knowledge nor the capacity to ensure" that disclosure provisions are enforced and that a fair fight results. *Rich*, 712 F.2d at 1185. Thus, under certain circumstances courts have enabled others to act for the shareholders.

After the *Piper* decision a number of federal lower courts found that a competing tender offer had a private action against the target company for injunctive relief. *Weeks Dredging & Contracting v. American Dredging*, 451 F.Supp. 468 (E.D. Pa.1978) (tender offeror established reasonable likelihood of success in his claim that certain statements by target company were material misrepresentation and court issued a preliminary injunction requiring the target company to send letters to its shareholders correcting the information); *Humana*, 445 F.Supp. 613 (motion to file complaint by tender offeror to require increased disclosure granted).

In this case, even if I found that Vermont American had violated the disclosure regulations, corrective disclosure would serve no purpose and has become a moot issue. Vermont American sought to sell the company, and now, has entered into a merger agreement. Furthermore, the repurchase program is no longer in effect. Given the present circumstances, Newell is no longer in the position of seeking to enforce the disclosure provisions on behalf of Vermont American shareholders. Any other type of equitable remedy that plaintiff may seek, such as divestiture of the stock obtained by Vermont American in its repurchase program is not compatible, in this case, with the intended purposes of the Williams Act. For the same reasons that the Supreme Court in *Piper* refused to find that the tender offeror has a private right of action for damages, Newell should be denied a remedy beyond corrective disclosure. *Rich*, 712 F.2d at 1186 (relief consistent with the Williams Act where no irreparable injury has been shown is corrective disclosure); *Chromalloy American Corp. v. Sun Chemical Corp.*, 611 F.2d 240, 241 ("relief beyond compliance with the reporting requirements is justified only if the petitioner can show irreparable harm in the absence of such relief"). Moreover, Newell has not shown that statements by Vermont American affected its tender offer and the mere fact that there is a violation of the Williams Act is insufficient for an injunction to issue. *Rondeau*, 95 S.Ct. at 2077.

8. Neither does Newell have a remedy as a shareholder of Vermont American. In rejecting the argument that the competing tender offeror was seeking an injunction in its capacity as a shareholder of the target corporation, the Supreme Court wrote in *Piper*:

> As a tender offeror actively engaged in competing for Piper stock [the target], Chris–Craft [the offeror] was not in the posture of a target shareholder confronted with the decision of whether to tender or retain the stock.

*Piper*, 97 S.Ct. at 946. Newell is in no position to make the case that it required the protection that the Williams Act disclosures are intended to provide.

I render no judgment on whether Vermont American's disclosure filings complied with the requirements of the Williams Act. I find that the relief that Newell has standing to pursue is moot at this time, in light of the sale of Vermont American.

## B. *State Law Claims*

### 1. Standard of Review

■ 9. Newell's claim, simply stated, is that the Vermont American Board of Directors, and particularly Lee Thomas, authorized certain actions in order to defeat Newell's valid tender offer, for no other reason (or at least as a primary reason) than the desire to perpetuate themselves in office. In particular Newell complains of 1) the use of corporate funds by the directors to repurchase an increased number of shares; 2) the restructuring of the Clairson transaction so that the Saueys would be issued voting stock to be voted in accordance with the recommendation of an independent committee of the Vermont American Board for a period of ten years; and 3) the lowering of the amount of stock needed to be acquired to trigger an existing Rights Plan. Newell asserts that this conduct constitutes a breach of the directors' fiduciary duties to the shareholders and cannot be justified under Delaware law. Vermont American defends its actions by stating that it perceived Newell to be a threat to the corporation and the shareholders' interest and that its response to Newell's attempts to obtain control of Vermont American is reasonable and is protected by the business judgment rule.

10. Under Delaware law the ultimate responsibility for managing the business and affairs of the corporation belongs to the board of directors. 8 Del.Code sec. 141(a) (1986). *See Smith v. Van Gorkom,* 488 A.2d 858, 872 (Del.1985). In fulfilling this responsibility the directors have a fiduciary duty to act in the best interest of the corporation and its shareholders. *Unocal Corporation v. Mesa Petroleum Co.,* 493 A.2d 946, 954 (Del.1985). This duty includes protecting the corporate enterprise and the shareholders "from harm reasonably perceived, irrespective of its source". *Id.* at 954.

The standard by which a court will review a board of directors' business decisions may depend on the context of the transaction and the potential for directorial misconduct. *See Robert M. Bass Group, Inc. v. Evans,* 552 A.2d 1227, 1239 (Del.Ch. 1988); *Air Line Pilots Association, Int'l v. UAL Corp.,* 717 F.Supp. 575 (N.D.Ill.1989). Ordinarily the court will apply the business judgment rule to a business decision and refrain from any substantive review of the board action. But when actions are taken by the board because of a threat to the control of the corporation and the board's actions are defensive in character, because of the "omnipresent specter that a board may be acting primarily in its own interests, rather than those of the corporation and its shareholders", a heightened test must be applied to determine whether a board is entitled to the protection of the business judgment rule. *Unocal,* 493 A.2d at 954. *See also Dynamics Corp. of America v. CTS Corp.,* 794 F.2d 250 (7th Cir.1986); *Revlon Inc. v. MacAndrews & Forbes Holdings, Inc.,* 506 A.2d 173, 180 (Del.1986).

11. The Vermont American Board was sensitive to the vulnerability of the company as a takeover target. Since at least December, 1986, when an *ad hoc* committee was authorized by the Board to study the potential threat to Vermont American's independence, the Board considered various measures to fortify the company. For ex-

ample, in 1987 the Certificate of Incorporation was amended by shareholder vote to eliminate cumulative voting, a Shareholder Rights Plan was adopted and "Golden Parachute" termination agreements were entered into with certain officers.

It is clear from the record, however, that the actions Newell complains of were adopted in direct response to Newell's tender offer. Vermont American repurchased relatively few shares in the repurchase program until Newell became a threat. One reason Vermont American did not purchase more shares before June 15, 1989 was because the price was too high. Nonetheless, after June 15, when shares were at the highest prices at which they had ever traded, the Board increased its purchases and enlarged the repurchase program. Similarly, the Clairson transaction was initially structured so that the Saueys would be issued nonvoting stock as consideration for Clairson. Instead, in the latter part of June, the agreement between the companies was that the Saueys were to be given *voting* stock to be voted pursuant to Vermont American's recommendations.

This is not to say that Vermont American's actions with respect to Newell are necessarily invalid. Indeed, a board of directors has a legal right, and at times a duty, to defend the corporation from real threats. *City Capital Associates v. Interco Inc.*, 551 A.2d 787 (Del.Ch.1988). But I do apply the *Unocal* analysis to test properly the legality of the Board's decisions.

12. The *Unocal* analysis requires a two-tier proportionality test which shifts the burden to the directors. The directors must first show that they had reasonable grounds for supposing that there was a danger to corporate policy or effectiveness. Second, the board must demonstrate that the measures they adopted in response to threat were reasonable in relation to the threat posed. *Unocal*, 493 A.2d at 955. These burdens can be satisfied by showing good faith and reasonable investigation. *Bass*, 552 A.2d at 1239. This requires an analysis by the directors of the nature of the takeover bid and its effect on the corporate enterprise. *Ivanhoe Partners v. Ver-*

*mont Mining Corp.*, 535 A.2d 1334, 1341 (Del.1987). If the board can satisfy these prerequisites the business judgment rule will apply to the board's action and the burden will shift back to plaintiff to overcome the business judgment rule's presumption of directorial propriety.

### 2. The Threat

 13. Under Delaware law, the board, when evaluating whether a threat to the corporation exists, may consider:

> under appropriate circumstances ... the inadequacy of the bid, the nature and timing of the offer, questions of illegality, the impact on the constituencies other than shareholders, the risk of nonconsummation, and the basic stockholder interests at stake, including the past actions of the bidder and its affiliates in other takeover contests.

*Id.* at 1341–42. Defendant explains that the Board was justified in defending against Newell's advances on the basis of Newell's offer and the differences between the companies. According to the Board, Newell's offer was: 1) coercive; 2) inadequate because although $30.50 per share was a greater price than what the shares traded for, it was less than the enterprise value of the company; and 3) not in the long-term interest of the shareholders. In addition, defendants argue that the business philosophies of Newell and Vermont American were diametrically opposed, and that if Newell were to obtain control or even board representation Vermont American's long-term prospects for the company would be disrupted.

14. A coercive offer exists where there is a perceived danger to the shareholders' freedom of choice, that is, where an offer is structured so that a choice by the shareholder not to tender shares may ultimately jeopardize the value of the shareholder's interest. *Interco*, 551 A.2d at 797–98. An example of a coercive offer is where the suitor makes a partial tender offer for shares in the target company, often for a price which target management will find is below a fair price for the company. When the offeror obtains a controlling position the remaining shareholders may be de-

prived of their shares through a "back-end" merger at a substantially lower price than originally offered by the tender offeror.

A noncoercive offer can be equally as threatening to the corporate enterprise and exists where the threat is founded on the inadequacy of the offer. That is, where the offer is unfair, ill-timed, under-priced and the target company board perceives that nonetheless, the shareholders may be enticed to accept the offer. Gilson & Kraakman, *Delaware's Intermediate Standard for Defensive Tactics: Is there Substance to Proportionality Review?*, 44 Bus. Law. 247, 256–58 (1989).

In the past Newell has been involved in attempts to acquire companies and the break-up of other corporations. Since 1986 the Board was aware that Dan Ferguson and Newell were interested in acquiring a significant stake in Vermont American. Newell's tender offer was only for a portion of the outstanding shares, subject to approval by Newell before the tendered shares would actually be purchased and no second-step was announced. This leaves many opportunities available to Newell. On the other hand, even if Newell's offer had been successful it would own only 23% of the outstanding shares. The inherent threat in this offer is not apparent until we recall the growing rift between the Thomas family and Dunbar family. The Dunbars' tendering of their 13% of Vermont American shares to Newell, in combination with a successful tender offer would entitle Newell to substantial influence over the direction of Vermont American. The law does not require that the directors face a coercive threat before acting to protect shareholders, and I need not decide here, as defendant assumes, whether the Board's action was a justified response to a coercive threat. *Interco*, 551 A.2d at 797–98 (board of directors may be equally justified in defending against a noncoercive offer as it would a perceived coercive offer).

15. Vermont American says that at a minimum, Newell posed the threat that the Board would have to contend with the disruptive presence of an entity whose corporate culture was substantially different and fundamentally at odds with its own. The notion that a corporation may act to preserve an established business policy is not novel and has been addressed by Delaware courts. In *Kors v. Carey*, 39 Del.Ch. 47, 158 A.2d 136, 141 (1960), the court stated that a corporation may be justified where it acts to protect itself from a tender offeror whose business methods "which stress liquidity ... and a readiness to sacrifice an established mode of doing business for quick profits, presented a threat of a possible business course which was entirely at odds with ... [the target corporation's] tradition." *See also Shamrock Holdings, Inc. v. Polaroid Corp.*, 559 A.2d 257, 260 (Del.Ch.1989) (when considering the validity of ESOP operating as a defense mechanism court elaborated on the culture developed at Polaroid, which included emphasis on employee involvement).

More recently in *Paramount Communications, Inc. v. Time, Inc.* [Current Transfer Binder] Fed.Sec.Rep. (CCH) ¶ 94,514 page 93,264, 1989 WL 79880 (1989), Chancellor Allen stated that the argument that a tender offeror presented a threat to the target's corporate culture was valid and could not automatically be dismissed as an excuse by the incumbent management to entrench itself. In *Paramount*, Time had entered into a merger agreement with Warner Communications designed to preserve the unique corporate culture the company had found to be economically advantageous. *Paramount, supra*, 93,267–93,-267.3. In response to a non-coercive offer from Paramount for much greater consideration, Time and Warner restructured their merger agreement. The restructured agreement provided that Time's management would remain in control of the newly formed entity. A significant amount of debt which resulted in a transfer of wealth from Time to Warner shareholders was added in the new agreement. And unlike the original agreement the new arrangement was purposefully designed so that shareholder approval was not required. In light of the much higher competing bid by Paramount, the Court of Chancery noted that such approval was not likely. Despite

these tactics, which clearly had the effect of entrenching management, the Court observed:

> [t]here may be at work here a force more subtle than a desire to maintain a title or office in order to assure continued salary or prerequisites. Many people commit a huge portion of their lives to a single large-scale business organization. They derive their identity in part from that organization and feel that they contribute to the identity of the firm. The mission of the firm is not seen by those involved with it as wholly economic, nor the continuing existence of its distinctive identity as a matter of indifference.

*Id.* at 93,268–93,269. Chancellor Allen noted several factors which legitimized the Time board's claim that their corporate culture was worth preserving. Time had developed a highly sophisticated culture, in a complex business, which permitted journalistic independence, and remained economically advantageous. The original Time–Warner agreement was specifically tailored to take into account Time's culture and retain it. The Time–Warner merger proposal, initiated because the Time directors perceived a need to globalize the company, was itself a means of effecting important corporate policy. Although in the restructuring of the merger certain actions were clearly reactive, the policy being defended had at its origin "non-defensive, *bona fide* business considerations." *Id.*

The evidence is uncontradicted, Newell's and Vermont American's success arises from distinctive corporate cultures and the companies are operated and managed according to significantly different business policies. Newell had long sought a stake in Vermont American. Vermont American's actions since the announcement of Newell's tender offer were not made in response to an unfamiliar entity. The Board's actions were made in light of new consultations with investment bankers and attorneys.[10] An independent committee was formed to consider a response to Newell's advances.

Under Delaware law where the directors take appropriate steps to inform themselves and in good faith, on the basis of information they obtain, determine that there exists a threat to the corporation and the shareholders, the directors may respond to the threat in a reasonable manner. *TW Services, Inc. v. SWT Acquisition Corp.,* [Current Transfer Binder] Fed. Sec. Rep. (CCH) para. 94,334, 1989 WL 20290 (Del.Ch. March 2, 1989) (directors' actions must be judged with respect to the surrounding circumstances and certain circumstances may in fact require the board to adopt strategy created to thwart attempts to sabotage the company's goals). After investigating Newell the Vermont American directors determined that their corporate culture, which was economically advantageous to the shareholders, was incompatible with Ferguson's approach to management in his companies.[11]

Although Lee Thomas' management style was successful, the claim that Vermont American's brand of management is essential to the long-term profitability of the company is weaker than Time's in *Paramount, supra,* where the Time management perpetuated a unique culture specifically designed to account for the somewhat inconsistent goals of promoting independence among managers and running a large corporation efficiently and profitably. Vermont American's culture is certainly not the only management style that will assure the success of the manufacturing company. Nonetheless, the Board's oversight and direction has resulted in a profit-

**10.** There is some suggestion in the evidence presented at trial that the bankers had their own agenda and that the alarm they sounded regarding Newell's intentions was exaggerated. Even so, the Board had an independent basis (their own knowledge of Newell and Dan Ferguson and his advances toward Vermont American) to recognize that Ferguson's method of management conflicted with the established policies and long-run projects at Vermont American.

**11.** Vermont American is a leading manufacturer of cutting tools and hand tools as well as power tool accessories and lawn/garden products. The success of the company largely can be attributed to Vermont American's reputation for reliable, quality service and its ability to anticipate the future needs of its clients. Over the years Vermont American has cultivated clients such as Sears, Roebuck & Co., for whom its service has become significant.

able, efficient and well-respected company. And, the Board is justified in protecting this against a reasonably perceived threat to this structure. Plaintiff argues that at most Ferguson sought a couple of seats on the Board and had no prospect of changing the management style at Vermont American. The Board's apprehension regarding Newell was still justified. If Newell's tender offer was successful it would assure Newell a significant position at Vermont American and even if Ferguson did not seek a dominant position his presence and his business philosophies could be disruptive. Furthermore, as defendants argue, if Newell acquired the interest it sought, the sale of the entire equity of the company would be substantially more difficult.

■■■ Vermont American's Board members did not necessarily violate their fiduciary duties because they found Newell's offer, which would have maximized shareholders' profits in the short-run, threatening. The directors may in good faith and on an informed basis pursue long-term interests at the expense of immediate value maximization. *Paramount, supra,* at 93,-277 (directors who act deliberately, in an informed way and in good faith pursuit of corporate interests, "may follow a course designed to achieve long-term value even at the cost of immediate value maximization"); *Mills Acquisition Co. v. Macmillan, Inc.,* 559 A.2d 1261, [Current Transfer Binder] Fed. Sec. L. Rep. (CCH) para. 94,-401 (Del.1989) (under Delaware law directors are under no obligation to act so as to maximize short-term value of the corporation or its shares, unless in the exceptional case where the corporation is in a "Revlon mode").

Vermont American was not for sale when Newell made its tender offer and the directors were not subject to the special duties discussed in *Revlon,* 506 A.2d 173. Vermont American did not prevent shareholders from taking advantage of Newell's tender offer, but after investigation determined that the offer was not in the corporation's best interest and it did not complement the business policies or objective the Board advocated at Vermont American.

The Board's defense—that it acted in response to its perception of the corporation's long-term interests—is bolstered, and Newell's argument that the Board acted to entrench Lee Thomas—is weakened, by the fact that Lee Thomas, individually, is a significant shareholder and that his primary source of income is derived from his holdings in Vermont American.

The role of the reviewing court is not to determine, in hindsight, if a company like Newell was actually a threat to Vermont American, but whether the target board after proper investigation was reasonable in its inclination to protect the company. This review must be done in the context of the particular circumstances of the target board. *See TW Services, Inc. v. SWT Acquisition Corp.* [Current Transfer Binder] Fed. Sec. L. Rep. (CCH) para. 94,334, 92,-181 (Del.Ch. March 2, 1989).

Newell's theme is that Vermont American demonstrably misconstrued its actions as a threat. The Bear Stearns report and some of the directors portrayed a Newell whose practice was one of creeping acquisitions, always starting as a mere seed of an investment and then blooming into full control. Newell says that a careful, accurate report and assessment (which was the duty of Bear Stearns and the directors) would have led to an indisputable conclusion that Newell always began creeping acquisitions by stating (in a 13(d) filing) that control was a goal that might be sought in the future. Newell's history is largely consistent in this respect—its 13(d) filings did give early signal of possible control aims in those cases where they did achieve control. And Newell did have a history of investments in which control was not sought. There is nothing wrong with the principle of this argument. If Newell had established a clear pattern that signaled those cases in which it had no possible intent to assume control, an investment banker would have a professional (or at least an ethical) obligation to advise Vermont American of this, and the Board could not arbitrarily disregard the signal.

Disregard of Newell's stated intent only to invest was not arbitrary here. Members

of the Board knew that Dan Ferguson was seeking one or two seats on the Board and was offering a standstill agreement. Ferguson's position in this respect was different from that stated in the 13(d) filing which did not mention board representation. The 13(d) representation that equity accounting was Newell's goal implies some desire to have the ability to influence corporate policies, and board representation may serve this purpose. However, reasonable directors could *perceive* board representation as far more suggestive of corporate control than is equity accounting, whether or not the law might regard it as material. Seeking the equity accounting method may not be perceived similarly because the method requires only the ability to influence, which ability may merely be presumed in some cases.

The absence of a 13(d) statement that board seats would be sought, coupled with Dan Ferguson's request for seats is a reasonable basis for the Board to entertain doubts of the sincerity of Newell's expressed desire only for investment. In short, they could reasonably perceive a threat.[12]

### 3. The Response

17. Having found that the Board had reasonable grounds to anticipate a threat to the corporation by Newell, under *Unocal* the Board must also show that their response to Newell's tender offer was reasonable. *Unocal*, 493 A.2d at 954. A Delaware corporation is specifically authorized to purchase, redeem or otherwise acquire shares of its own stock, provided that the corporation's capital is not impaired. Del.Code Ann. tit. 8 sec. 160(a)(1) (1983). Vermont American's repurchase program was in effect since October, 1988. In response to Newell, the Board doubled the

repurchase program. Board members testified that it was not the immediate intent of the Board to repurchase all 2.2 million shares. Instead, the Board would permit the repurchase of 300,000 shares at a time, as it had in the past. With the assistance of their bankers and lawyers the Board would evaluate Vermont American's circumstances to determine whether more shares would be purchased. The large authorization was to enable Vermont American to have flexibility and to protect itself if Newell's offer was successful. If all the shares authorized were obtained, Lee Thomas would have functional control of an amount of the outstanding shares precariously close to 50%.[13] We are not convinced that this is evidence of Thomas's intent to entrench himself.

It is common practice for boards to authorize significantly greater purchases than actually intended. For example, Vermont American only purchased 84,647 of the 1,100,000 authorized in 1988. There is no indication that Vermont American embarked on a program to repurchase all the shares it had authorized. When this Court enjoined the repurchase program Vermont American had only repurchased about 325,-686 shares in connection with the redoubled program. Nor is there evidence that the purpose of the enlarged repurchase program was primarily for the entrenchment of Lee Thomas and not merely a valid means to oppose Newell's tender offer.

Courts have frequently upheld as reasonable, business judgments by a board to authorize repurchase programs or self-tenders, even where the program makes the takeover more difficult and has the effect of fortifying the current management's control of the corporation. *Shamrock Holdings*, 559 A.2d 257 (court ap-

---

**12.** This is not to say that Newell did in fact intend to seek control. A great deal of Vermont American stock was held by a small number of persons. Even the purchase of the Dunbar stock would not give control to Newell. It may well be that Newell was aware of the conflict between the Dunbars and Thomases and acted to precipitate a resolution of the conflict which could be foreseen to be a sale of Vermont American, resulting in a significant profit to Newell

on its shares. In other words, Newell may have acted to take its profit on its investment.

**13.** Plaintiff also charges the Board with instituting a repurchase program which would give the Thomases and Dunbars a combined interest of over 50%. This fact is not evidence of the Board's entrenchment intent; the record clearly supports that it could no longer be assumed that Ellen Dunbar's and Lee Thomas' interests were aligned.

proved a $1.1 billion stock repurchase plan, financed in part by a sale of preferred stock to a "friendly" third party, following which company, ESOP and friendly investor would own 33% of stock); *Gelco Corp. v. Coniston Partners*, 652 F.Supp. 829 (D.Minn.1986) (approving an exchange offer for the target company's shares, for a combination of cash and preferred stock at a value below the bidder's all-cash tender offer, after which management and a financial officer would control 58% of the company's voting power), *vacated in part on other grounds*, 811 F.2d 414 (8th Cir.1987).

Similarly, stock repurchase programs funded by corporate monies, which give stockholders an alternative to a hostile offer, have been expressly endorsed by Delaware courts as an appropriate response to an unsolicited tender offer found to be inadequate. *SEC v. Carter Hawley Hale Stores*, 760 F.2d 945 (9th Cir.1985) (court upheld board action buying back more than half of the target's outstanding shares, in addition to placing a substantial number of shares in friendly hands to be voted in accordance with the target board's wishes, and granting the new shareholder a favorable option on one of its most valuable divisions); *Kors v. Carey*, 39 Del.Ch. 47, 158 A.2d 136, 141 (1960) (stock repurchase program instituted to deter "clear threat to the future of their business", upheld where board's response was based upon the fears that the two corporations' business policies were fundamentally divergent). *See also Ivanhoe Partners*, 535 A.2d 1334. Delaware law does not require a board to remain passive when faced with a hostile takeover. The law does, however, prevent directors from entrenching themselves or from denying shareholders their rights as owners. The stock repurchase program neither coerced shareholders into selling their shares to the corporation nor foreclosed them from pursuing other options. The Board's repurchase program, evaluated alone or in conjunction with other actions taken by the Board, is not an unreasonable defense measure in light of the perceived threat posed by Newell.

18. The Board of Directors took advantage of another opportunity to thwart Newell's plan to acquire a greater stake in Vermont American. The Board rearranged the agreement with Clairson, giving the Saueys, in consideration of the merger, voting Convertible Preferred Stock, to be voted by an independent committee of the Vermont American Board. This means that 755,883 shares, or approximately another 7% of Vermont American's outstanding shares, would be voted by Board members.

Delaware law does not prohibit a board from issuing voting stock to "friendly third parties", so long as the placement can be justified by a valid corporate purpose; such as deterring an inadequate or coercive bid which the board finds is not in the corporation's best interest. *E.g., Gelco Corp. v. Coniston Partners*, 652 F.Supp. 829 (D.Minn.1986) (court refused to enjoin issuance of stock to friendly party where inadequate offer was made by acquiror with reputation as a raider); *Heit v. Baird*, 567 F.2d 1157, 1161 (1st Cir.1977) (court upheld issuance of new stock to directors since transaction may have served a number of proper business purposes, including "warding off raid by persons believed to be intent on harming the corporate enterprise"); *Treadway Cos. v. Care Corp.*, 638 F.2d 357 (2nd Cir.1980) (issuance by target company of shares of stock to friendly third party which resulted in dilution of potential bidder's 34% ownership of stock to 28% was not an attempt by incumbent management to improperly perpetuate its control over the company). Vermont American sought to reduce the impact that Newell might have on the company if it were successful in obtaining a large investment in Vermont American, by issuing shares which the Board knew would not be controlled by hostile hands.

A board's decision to revise a corporate transaction in reaction to a hostile acquisition has been upheld in Delaware courts, where 1) the corporate transaction originated for *bona fide* business purposes and 2) the structure of the transaction was not primarily motivated by the desire to entrench. *Paramount, supra*, 93,283; *Shamrock*, 559 A.2d 257 (Del.Ch.1989);

*Heit,* 567 F.2d at 1161. The Clairson transaction was considered by the Vermont American Board at least since the Fall of 1988. The purpose was simply to add a division to Vermont American which would complement the existing business. The transaction was subsequently modified to take into consideration the threat of acquisition by Newell. Delaware law does not require a Board to forego opportunities to adopt conventional defenses nor to ignore potential threats when effecting business transactions. The agreement with the Saueys was conducted in good faith, was the product of arms-length negotiations, and the stock will be voted in accordance with the recommendation of an *independent* committee of the Board. The voting restrictions were personal to the Saueys and are not an obstacle to future acquisition of the shares. Given the threat posed by Newell it was not unreasonable of the directors to structure the transaction so that the likelihood that Newell will exercise control of the Board is reduced.[14]

19. The amendment of the Shareholder Rights Plan to lower the trigger from 27% to 15% was announced on July 12, 1989, in conjunction with Vermont American's decision to explore the sale of the company. Vermont American explains the amendment was necessary to protect the process by which the sale would be conducted and prevent the transfer of large blocks of stock. Newell argues that the purpose of the amendment was to entrench Lee Thomas. Originally, Newell claims that the pill was discriminatory in nature because it prevented Newell from acquiring the 20% of Vermont American's stock needed to use equity accounting. The amendment also limited the application of the Rights Plan to any person who acquired 10% of the Class A Stock after February 17, 1988, an exception benefitting only Lee Thomas was created. Subsequently, on July 31, the Board revised the Rights Plan to lower the

amount Thomas could purchase without triggering the Plan from 10% to 2%. The Williams Act prohibited Lee Thomas, because of his inside information, from purchasing shares during the 120 days the amended Rights Plan and the search for a buyer of the company were in effect. This, in combination with the elimination of the discriminatory affect of the Rights Plan, suggests that the amendment was truly a business judgment by the Board to maintain an even playing field for the auction process. *Interco,* 551 A.2d at 798 (court notes that the deployment or continuation of a poison pill will serve as a method to permit the board to preserve the auction process). Therefore, the amendment was a business decision protected by the business judgment rule.

#### 4. Motivation

■ 20. Once I determine, as I have, that the Board of Directors has satisfied the *Unocal* test by showing that they had reasonable grounds for finding a threat to the corporation and their response was reasonable in relation to the threat posed, the business judgment rule will apply to the Board's decision. In order to rebut the business judgment rule's presumption Newell must show that the defendant's sole or primary motive was to retain control of the corporation. *Panter v. Marshall Field & Co.,* 646 F.2d 271, 297 (7th Cir.1981); *Johnson v. Trueblood,* 629 F.2d 287, 292–93 (3rd Cir.1980); *Unocal,* 493 A.2d at 955. Potentially any attempt by the directors to resist a change of control will have the effect of strengthening the directors' control over the corporation. Merely introducing evidence that *one* of the board's motives was to retain control is not sufficient to overcome the normal presumption that the directors' actions were advanced in good faith. *Treco, Inc. v. Land of Lincoln Savings and Loan,* 572 F.Supp. 1451, 1454 (1983).[15]

---

14. I recognize that authorization to the independent committee is revocable by the Board, but, if nothing else, this litigation should serve as counsel to the Board that actions which hint of entrenchment are not in their interest.

15. The directors recognized that action to fortify the corporation will frequently operate to entrench incumbent management as well. In a letter to his attorney, dated April 2, 1987, Lee Thomas discusses his concern that, action designed to perpetuate company objectives also have an entrenchment effect:

Vermont American had an independent board. At least four directors were outsiders, added to the Board to monitor activity and to insure that those directors with a personal interest in retaining control of the corporation acted in the shareholders' and the investing public's best interest. Whether an independent board actually legitimizes board action is arguable. *See* Brudney, *The Independent Director—Heavenly City v. Potemkin Village*, 95 Harv.L.Rev. 597 (1982); Solomon, *Restructuring the Corporate Board of Directors: Fond Hope—Faint Promise*, 76 Mich.L. Rev. 581 (1978). For a variety of reasons, independent directors are frequently susceptible to the influence of management and will sympathize with the insiders on the board. *See* Mace, *Directors: Myth or Reality—Ten Years Later*, 32 Rutgers L.Rev. 293 (1979). In any event, at Vermont American, although there is some suggestion that the independent committee believed that Lee Thomas' leadership was essential to the company, this is not necessarily inconsistent with their primary obligation to the shareholders. The independent committee considered issues apart from the entire Board, with particular attention to the advice of investment bankers and attorneys with regard to the interest of the corporation.[16]

Newell seeks to prove the Board's intent to entrench itself by pointing to notes and letters where the directors make statements such as "we need to be certain of control—we can forget about Newell" or "Screw Newell—go get the shares." Even as early as January, 1987, one director noted in writing "Lee very worried about control" and "Control agreement for Lee." These statements and the desire to retain control of the corporation in the face of the potential threat posed by Newell are not incompatible with the directors' duties to protect the corporate entity under Delaware law. I note again that a director is obligated to defend the target corporation when they determine an acquisition is not in the corporation's best interest.

There is evidence in the record that at one time the Board, confronted with the rift between the Dunbars and Thomases and the company's general susceptibility to takeover, embarked on a mission to fortify the company against all unsolicited acquisitions and perhaps even insure that Lee Thomas would remain at the helm of Vermont American.[17] This arose out of concern over the shares held by Ellen Dunbar and may not have been directed against any particular potential acquiror. Moreover, some proposals and perhaps even the stock repurchase program would have given Lee Thomas control over stock that amounted to nearly 50% (or more) of the outstanding voting shares. I assume *per se* illegal any takeover defense that puts

---

At the last Board meeting, while we were discussing so called blank check preferred, Tom Dunbar stated that this was just an effort at entrenchment of management. I responded in substance: of course, but entrenchment is a relative term—nobody ever gets entirely entrenched but we have enough uneasiness in the management group we've developed at Vermont American that we had better do something to reassure those people if we are going to continue to have high quality management around here.

16. The refusal of the Board to meet with Dan Ferguson to discuss a business combination with Newell neither signifies the Board's bad faith nor the outside directors' lack of independent judgment. Board members were well informed regarding Newell, and at least one director, Furst, had personal contact with Dan Ferguson. Furthermore, the Board permitted Bloomberg to address Newell on behalf of Vermont American.

17. Lee Thomas, as well as other directors, testified that Thomas' management style was particular to the Quaker philosophy. At meetings Lee Thomas strove for consensus and compromise. Generally, before any formal record was made, agreement among the directors was achieved and the votes would reflect a unanimous board. Although this would seem an admirable, and even enviable, means to do business, it does result in a less than complete record of Board activity and the Board's procedural steps are difficult to trace. I note this because Delaware law places a high premium on the procedures the board follows when making a business decision where their control is threatened. The record here was sparse and lacks information regarding individual Board member's positions. This makes it even more difficult for the trier of fact to distinguish between responsible corporate conduct, that stabilizes management but also tends to increase management's control, from conduct primarily designed to entrench.

irrevocable voting control in the hands of one person and achieves it without shareholder approval and with corporate funds. The intent to entrench, without more, however, violates no law. Virtually none of the entrenchment proposals were adopted. The stock repurchase program which was large in scope was small in execution, at least until June 15, 1989. Prior to that time the stock repurchase program was too meager to be a product of an intent to entrench. The repurchases in response to the Newell tender offer were large enough and taken under circumstances that do support the claim that they were acts of entrenchment. Indeed, I thought there was sufficient likelihood of this, subject to conditions, and I enjoined them.

The question after trial is whether the acts were taken with the intention to entrench. It is quite clear that after July 12, 1989, when the decision to sell Vermont American was made, there was no intent to entrench. Was there an intent to entrench when the decision was taken to meet Newell's tender offer with stock repurchases? The answer depends on whether I believe Lee Thomas and the independent directors. I do. There is no question that the directors and Lee Thomas wanted very much to keep the company as it was, independent and under its management, but I do not believe they permitted their desires to replace their judgment or subvert their duties to their shareholders.

Some of what was done by Vermont American's Board can reasonably be interpreted as entrenching. Newell so interprets. All of the Board's actions can reasonably be interpreted as appropriate reactions to a perceived threat to the corporation. The key to interpretation of the acts is (not withstanding some literary theories of interpretation) the intention with which they were performed. I find that, at least from the time that the Board retained Bear Stearns, the actions of the directors were motivated by their fiduciary obligations to the corporate entity. From at least the time the outside directors retained independent counsel, they acted to fulfill their duties under the corporate charter. Under the facts as I have found them, no acts performed by defendants of which Newell complains were contrary to Delaware law.

It could be said, then, that Newell's appearance as hostile acquiror and a threat to the corporation, actually saved the directors from breaching their fiduciary duties to the shareholders. It was reasonable for the Board to determine that Newell's advances were not in the best interest of the shareholders, and the Board's action in response was primarily to protect the shareholders' interest and the corporation's existence. Although—and perhaps, happily for Lee Thomas and the Board—these actions fortified their control of the corporation, their primary motivation, to protect the company and to pursue their presently successful long-term goals, is valid under Delaware law.

The Vermont American Board's decisive efforts to sell the company give further credibility to the view that the Board sought to preserve the corporation for the best interest of the shareholders. And the recent announcement of the merger of the corporation with Emerson and Bosch confirms this. It is not a trivial point that Lee Thomas is the largest shareholder in Vermont American, and his income is largely derived from his equity interest in Vermont American. Any scrutiny of motives must take into consideration the identity of his interests with those of the shareholders who seek a maximum profit on their ownership interest.

21. Given what Vermont American knew of Newell's history of corporate acquisitions and its corporate objectives, the Board was not unreasonable in perceiving a threat to the corporation. The Board's response was reasonable and motivated by a sense of their duty to the corporation and its shareholders. I apply the business judgment rule to the Board's decisions and refrain from substantive review.

C. *Vermont American's Counterclaims*

22. Section 13(d) of the Securities and Exchange Act of 1934, 15 U.S.C. sec. 78m(d), requires any person who acquires, directly or indirectly, more than 5% beneficial ownership interest in any class of equi-

ty security to file a statement of ownership with the Securities and Exchange Commission, within 10 days of reaching the 5% threshold. A Schedule 13D should be filed, stating 1) the background and identity of the acquiring persons; 2) the source and amount of the funds used in making the purchases; 3) if the purpose of the purchases is to acquire control of the issuer, any plans to make any major change in its business or corporate structure; 4) the number of shares of the security which the acquiring person beneficially owns; and 5) whether the acquiring person has any contracts, agreements, or obligations regarding the issuer's stock. 15 U.S.C. secs. 78m(d)(1)(A)–(D). Section 13(d) requires the person filing to disclose material facts that a reasonable shareholder would consider important in deciding how to vote or tender shares. *TSC Industries, Inc. v. Northway Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). An amendment to Schedule 13D must be filed promptly, if any material change occurs in the facts. Section 14(d), 15 U.S.C. sec. 78n(d), requires filing and disclosures by a tender offeror of the type specified in Schedule 13D under section 13(d). T. L. Hazen, *The Law of Securities Regulation* sec. 11.14, at 355.

■ Vermont American contends that Newell has violated 13(d) disclosure obligations by failing to disclose any intent to obtain board control and to exert substantial influence over the business and operations of Vermont American in its original Schedule 13D (filed in April 1988) and in its amendments nos. 1–6. Defendants also say that Newell violated secs. 13(d) and 14(d) by failing to disclose, at the time of its tender offer, that it sought board representation and a significant equity interest in Vermont American. In this circuit, an issuer corporation has an implied right of action under sec. 13(d) to seek injunctive relief to enforce the complete and accurate disclosure filings. *Indiana National Corp. v. Rich*, 712 F.2d 1180, 1186 (7th Cir.1983). The right to receive information, however, does not belong to the corpo-

ration, but to its shareholders, and Vermont American's standing to sue under 13(d) is representational.[18] *Champion Parts, Inc. v. Oppenheimer & Co.*, 878 F.2d 1003, 1007 (7th Cir.1989) (issuer corporation entitled to maintain underlying injunction action only to vindicate the rights of the shareholders).

The purpose of the filing provisions is to give "investors and stockholders the opportunity to assess the insurgents' plans *before* selling or buying stock in the corporation." *Bath Industries, Inc. v. Blot*, 427 F.2d 97, 113 (7th Cir.1970) (emphasis in original). Information considered material includes a plan that would result in a change in the make-up of the board or directors of the company, 17 C.F.R. sec. 240.13d–101 (1988), and any aspirations by the filer to seek a control position. *GAF Corp. v. Milstein*, 453 F.2d 709, 720 ("section 13(d) was intended to alert shareholder to potential changes in corporation control" so that shareholders can make informed decisions before changes occur).

■ Vermont American's basis for finding that Newell had an intent to acquire control includes: 1) various informal conversations between Dan Ferguson and individual Vermont American Board members or Vermont American's investment bankers, 2) Ferguson's admission that he received a report discussing acquisition candidates and threw away all the material except that pertaining to Vermont American, and 3) Rothschild, Inc.'s report for Newell in October 1987, supposedly for the limited purpose of assisting Newell in its tender offer, which is devoid of reference to equity accounting or minority positions, but which catalogues issues addressed in connection with efforts to obtain equity control, and 4) Newell's general history of acquisitions. This evidence does not indicate that Newell's intent is as grandiose as Vermont American seeks to infer. The most that can be derived from these informal discussions and consultations with investment bankers is that Newell was in the preliminary stages of exploring options with respect to its investment in Vermont

---

**18.** The counterclaims are brought solely by defendant, Vermont American.

American. Dan Ferguson does not deny this.

██ Disclosure of a control purpose is required even where the filer does not yet have a finalized plan for exercising control. *See Dan River, Inc. v. Unitex, Ltd.,* 624 F.2d 1216 (4th Cir.1980) (purchaser's intent to acquire 20% equity interest, and thereby obtain some representation on the target company's board held to create an obligation to disclose a plan to acquire control); *Champion Parts Rebuilders v. Cormier Corp.,* 661 F.Supp. 825, 850–51 (N.D.Ill. 1987) (failure to disclose control intent despite defendant's then-present inability to accomplish plans to acquire control). Where, however, plans are indefinite or contingent, to impose a duty on the person failing to disclose fleeting thoughts or long-range possibilities of acquisition would be misleading to investors. *Chromalloy American Corp. v. Sun American Corp.,* 611 F.2d 240, 248 (8th Cir.1979). *Compare USG Corp. v. Wagner & Brown,* 689 F.Supp. 1483, 1489 (N.D.Ill.1988) (Schedule 13D disclosures adequate where defendants had no concrete intentions, but were considering various options, including purchasing more shares on the open market, suggesting a recapitalization and selling its shares of plaintiff's stock) *with Dan River,* 624 F.2d 1216 (disclosures stating that purpose of investment was passive, found misleading, where defendants were exploring several alternatives all premised on obtaining 20% of the outstanding shares and board representation).

██ The function of the court in enforcing the securities laws is not to engage in exhaustive nit-picking or to provide management with a weapon to prevent accumulation of stock. *Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49, 58, 95 S.Ct. 2069, 2075, 45 L.Ed.2d 12 (1974). The record enables us to attribute to Newell thoughts of obtaining control of Vermont American, but does not provide evidence of developed plans.

In any event I cannot say that further disclosure would be material, as the shareholders were already informed that Newell desired to exert influence over Vermont American's operations. Even if Newell sought board representation, this is not wholly inconsistent with Newell's stated intent to achieve equity accounting, where the investment potentially must be more than passive. Moreover, Vermont American was not ignorant of any motives beyond equity accounting that Newell might have entertained. Earlier, I discussed the detailed procedures undertaken by Vermont American to inform itself about Newell and the threat it might pose to the company. A court may consider whether to require offerors to disclose matters that are known equally well to the target company, as those issues can be left to the target's response. *See Missouri Portland Cement Co. v. Cargill, Inc.,* 498 F.2d 851, 872–73 (2nd Cir.1974). *See also Kennecott Copper Corp. v. Curtiss–Wright Corp.,* 584 F.2d 1195, 1200 n. 4 (2d Cir.1978) (quoting *General Tire Corp. v. Talley Industries,* 403 F.2d 159 (2nd Cir.1968)) (failure of offeror "to correct alleged misstatements or rectify claimed omissions is some evidence that it did not regard them as material").

With respect to the tender offer no purchases were made. Therefore, no shareholders were injured by reliance on inadequate disclosure. Given the probable sale of the company there is no purpose in demanding further disclosure of Newell. With respect to the 13(d) claims relating to shares acquired prior to Newell's tender offer, Newell has disclosed the possibility it will seek control in its amendment no. 7. As noted previously, section 13(d) is a disclosure statute intended for the benefit of the shareholders, Vermont American's sole basis of standing is to insure that a complete and accurate Schedule 13D is filed in accordance with the statute. Corrective disclosure has been made and now defendant's claims are moot. *Rondeau,* 95 S.Ct. at 2076.

### III. CONCLUSION

Newell has standing to proceed in this derivative suit against Vermont American, but has no claim to an individual injury. Any claims which Newell may bring as a

tender offeror under the Williams Act are moot and this Court has no jurisdiction to review whether Vermont American violated the federal securities laws.

Lee Thomas and the Vermont American Board did not breach their fiduciary duties to the shareholders in opposing Newell's desire to increase its equity investment in Vermont American. Newell is not entitled to divestiture of the shares purchased by Vermont American under its repurchase program or any other equitable relief.[19]

Whatever misleading statements Newell may have made in SEC disclosure filings have been corrected by subsequent filings or are mooted in light of the likely sale of Vermont American.

---

**19.** I put to one side (because it has no relevance here) the degree to which Vermont American can rely on these findings (largely favorable to them) in another lawsuit, as they assert I do not have jurisdiction to make them.